**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**SECOND JUDICIAL DISTRICT COURT**

**HOLLOW SPIRITS, LLC,**

      **Plaintiff,**

**v.**                           **No. _____**

**CORSON DISTILLING SYSTEMS, INC.,**

      **Defendant.**

## COMPLAINT FOR DAMAGES

      COMES NOW Plaintiff Hollow Spirits, LLC, ("Hollow Spirits") by and through its counsel of record, Giddens, Gatton & Jacobus, P.C. (H. Jesse Jacobus, III), and, for its Complaint for Damages against Corson Distilling Systems, Inc., ("Corson") hereby states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Hollow Spirits, is a domestic Limited Liability Company with its principal place of business in Bernalillo County, New Mexico.

2. Defendant, Corson, is a foreign corporation with its principal place of business in Boise, Idaho.

3. Defendant Corson knew, or should have known, that it was doing business with a New Mexico company at all material times.

4. Upon information and belief, Defendant Corson has done business in New Mexico prior to selling a still to Plaintiff.

5. Specifically, Corson had recently sold a still to Glencoe Distillery, LLC, which is located in Ruidoso, New Mexico.

6.  Venue in this Court is proper.

EXHIBIT A

7.  Either by virtue of doing business in New Mexico with Plaintiff and/or by virtue of doing business with Plaintiff and having also done business in New Mexico with Glencoe Distillery, LLC, Defendant Corson has met the requirements of New Mexico's Long Arm Statute, NMSA 1978 § 38-1-16(A), *et seq* such that jurisdiction is proper in this Court.

## FACTS COMMON TO ALL COUNTS

8.  Plaintiff incorporates all previous allegations as though fully set forth herein.

9.  In March of 2017, Plaintiff was in the process of opening an Albuquerque craft distillery and was in the market for a still.

10. Plaintiff's target date to open its distillery was March 2018.

11. Corson's advertising materials, including its website and "YouTube" videos, emphasized the fact that Corson's was an American manufacturer, which was attractive to Plaintiff.

12.  Plaintiff also reviewed Corson's YouTube advertising videos, specifically, a video located at https://www.youtube.com/watch?v=nBKrFxkdY1Q, which was two minutes and forty three seconds in length.

13. In that video, one of Corson's owners, Tory Corson, expressly stated that: "the difference at Corson's is that we focused our entire company on the startup craft distilling industry. So all the stuff those guys don't offer, we added it. It has gone a long way towards helping our customers get off the ground faster and more affordably than if they'd bought from one of our competitors."

14. This representation by Mr. Tory Corson attracted Plaintiff to do business with Corson's because Plaintiff was, and is, a startup craft distilling business.

EXHIBIT A

15. Also in the video, Corson's other owner, Josh Corson expressly stated "The cool part about it is now we get to help lots of craft distilleries start distilleries. So instead of having our own distillery, we have lots of distilleries."

16. This representation by Mr. Josh Corson further attracted Plaintiff to do business with Corson's because Plaintiff understood this representation to mean that Defendant understood the needs of startup distilleries, was attentive to customer needs, including responsiveness to questions and timely delivery of a quality product.

17. In another YouTube video, located at https://www.youtube.com/watch?v=01e3FUDIzwo, Mr. Tory Corson further represented that Defendant was on its way to "becoming the global leader in distillery equipment."  Plaintiff understood this to be a further representation of Defendant's commitment to quality, timely, attentive, and communicative delivery of a good quality still.

18. Plaintiff viewed Defendant's website which advertised that the "CURRENT BUILD TIME" for its stills was "24-30 WEEKS", which in Plaintiff's estimation, would have left ample time for construction, delivery, installation, and testing of the new still, well in advance of Plaintiff's target opening date.

19. Plaintiff also conducted internet research for negative feedback about Defendant Corson. Plaintiff found none.  Upon information and belief, Plaintiff believes it did not find negative feedback on Corson with regard to late delivery of stills, poor workmanship, and or failure to deliver stills at all because Defendant Corson engaged in a pattern and practice of threatening customers it had mistreated into removing such comments.

20. In addition, Corson as a part of its fraudulent business model, included arbitration clauses in its contracts, and insisted that customers with whom it had a dispute, sign Non-Disclosure

EXHIBIT A

Agreements ("NDAs") as a way of keeping Corson's many failures from becoming public, and sweeping them under the rug.

21. Corson's YouTube videos do not state that it requires all customers to sign a contract that contains language stating that Corson is not bound to deliver any still by any particular date.

22. Corson's YouTube Videos do not state that it will routinely refuse to give a customer a firm delivery date and make the excuse that it cannot do so because it "custom builds" the stills and because, in Corson's view, copper is so difficult to work with that it is impossible to guarantee any firm delivery date.

23. Corson's website advertisement does not state customers should not rely on Corson's "CURRENT BUILD TIME" of "24-30 WEEKS" and/or that Corson cannot, and has routinely failed to meet delivery dates for its customers.

24. Plaintiff decided to do business with Corson because of the absence of negative comments about the company, and because Corson offered an American made product, from a company that focused on startups, with a build time that was faster than competitors, at a lower price.

25. On March 16, 2017, Plaintiff received an initial quote for equipment, including a 700 gallon pot still, from Corson of $134,000.

26. During a telephone conversation, Corson stated that after Plaintiff paid its deposit, Corson would provide Plaintiff with access to its engineers who could answer any specific technical questions Plaintiff had.

27. The deposit Corson required was one half of the full purchase price.

28. On March 30, 2017 Corson corrected its original quote to $120,500.

4

EXHIBIT A

29. On April 6, 2017, Plaintiff requested that Corson provide a detailed list of items included with the purchase price to which Corson responded "We don't have a list until it ships and we include the packing list, but the schematics show everything that comes with our equipment."

30. On April 14, 2017, Plaintiff wired $60,250.00 to Corson which represented one-half of the originally quoted price of $120,500.

31. At no time prior to receiving Plaintiff's wired money did Corson employees tell Plaintiff, via email, or telephone conversation, that it could not meet **any** set delivery date whatsoever, due to alleged difficulties in working with copper.

32. On April 17, 2017, Plaintiff asked Corson to provide detailed documents showing the parts, pieces, attachments, and piping that consisted of Plaintiff's order. Plaintiff further requested a user manual showing how to use the equipment and contact information for Corson's engineering department who could answer Plaintiff's questions.

33. Corson responded "Absolutely! I will have our project managers info. Shortly, when they are assigned. In the meantime, I can schedule a call with the engineering department whenever your team is ready. Also, I have them working on your list as well!"

34. On April 20, 2017, Corson again told Plaintiff "engineering is working on your list. Just wanted you to know we didn't forget."

35. Despite making these promises, representations, and assurances, Corson has never provided Plaintiff with the name of the project manager, put Plaintiff in touch with Corson's engineering department, or provided Plaintiff with a parts list.

36. On April 21, 2017, Plaintiff signed a written "Quotation" and "Purchase Agreement" attached hereto as Exhibit A.

EXHIBIT A

37. At the time Plaintiff signed this document, because it had already wired its money to Defendant, Plaintiff did not notice that the purported Quote and Purchase Agreement contained language that purported to: eliminate any obligation for Corson to deliver the equipment consistent with its advertised build time of "24-30 WEEKS", limit damages for failure to timely deliver or anything else to the fee paid for the equipment, and compel arbitration.

38. Due to the representations made in Corson's advertising, Plaintiff expected delivery of its equipment in "24-30 WEEKS", which would have been approximately late October or early November 2017.

39. On June 8, 2017, Corson again promised to provide updates on Plaintiff's order "as it moves through each stage, we will update you and provide the documentation needed." Corson never provided any such updates.

40. On June 14, 2017, Plaintiff advised Corson that it needed to change its order. Instead of a 700 gallon system, Plaintiff was requesting a 400 gallon system. However, Plaintiff added a mash tun and two fermenters to the order which increased the purchase price to $143,500.

41. On June 16, 2017, Plaintiff wired Defendant an additional $11,500 which, along with the money Plaintiff had already paid, represented the down payment of 50% of the new price of $143,500.

42. Plaintiff also signed a new "Quote." See Exhibit B.

43. Prior to receiving Plaintiff's additional money, Corson never told Plaintiff that any of its requested changes would result in a longer build time.

44. However, even if Defendant had not done anything in the previous nearly two-months since Plaintiff made its original down payment, pursuant to Defendant's advertised "24-30 WEEKS" build time, Plaintiff's equipment should have been completed between November 29, 2017 and January 10, 2018, at the latest.

EXHIBIT A

45. Subsequent to receiving Plaintiff's money, Corson refused to provide any detailed updates, confirm any completion date, or communicate effectively with Plaintiff's requests for information.

46. It was not until August 11, 2017, that Corson stated, in writing, that Plaintiff's changes "can and does move the initial estimated time of completion."

47. Defendant also refused to permit Plaintiff to go to Boise, at Plaintiff's expense, to inspect the still before tendering another $75,000.

48. On September 1, 2017, Plaintiff expressly told Defendant that construction on its build out was scheduled to begin in seven (7) weeks, so time is of the essence.

49. Corson again refused to provide any update, or answer any substantive questions, claiming "September is very busy for everyone."

50. On September 29, 2017, in response to another inquiry from Plaintiff the day before, Corson confirms that "Your build is moving right along. The estimated date of completion remains the same…"

51. On October 23, 2017, Corson finally confirmed that "The estimated date of completion is at the first part of January.  I will have more specifics as we get closer."

52. On November 9, 2017, Corson again confirmed in writing that "Everything is moving right along in production with no changes at this time." By this time, Corson had ignored several requests from Plaintiff that it provide photographs of Plaintiff's equipment showing any progress.

53. After failing to respond to written requests for updates (or photographs) from Plaintiff, on December 6, 2017, Defendant finally wrote Plaintiff stating "Your estimated date of completion has moved a little from mid-January to the end of January…"

EXHIBIT A

54. Defendant gave no reason for this change.

55. During the month of December 2017 Corson refused to answer questions as to why the delivery date had changed, or what issues caused the delay, or responding to Plaintiff's request to inspect its equipment before making the final payment.

56.  On December 14, 2017, Corson wrote Plaintiff stating that it would not permit Plaintiff to inspect its equipment and for the first time, claimed that pursuant to the Purchase Agreement, "This time frame is an estimate and not a guarantee".

57. In December 2017, Plaintiff became alarmed when it learned, through an Idaho Statesman article, that Defendant had been sued by several customers for taking money and delivering equipment late, not delivering equipment at all, and/or failing to deliver equipment that work properly. See Exhibit C (article).

58. In addition, Plaintiff also learned through a separate source, that one of the Corson customers that received late and/or non-functional equipment from Defendant was Glencoe Distillery in Ruidoso, NM.

59. Upon information and belief, Plaintiff believes Defendant has engaged in a pattern and practice of taking money from customers, including other New Mexico customers, and failing to deliver products timely, and/or of appropriate workmanlike quality.

60. When those customers complained, Defendant has engaged in a pattern and practice of pointing to its grossly unfair and unconscionable Purchase Agreements as an excuse for its failure to meet its own advertised deadlines and poor craftsmanship.

61. Defendant has been successful in continuing to fool customers by sweeping its own fraudulent conduct under the rug by either compelling arbitration, or requiring wronged customers to sign "NDAs."

8

EXHIBIT A

62. Defendant did not meet its "early January" and "end of January" delivery commitments to Plaintiff.

63. Despite Plaintiff's written demand, Defendant has refused to return Plaintiff's money.

### COUNT I: BREACH OF CONTRACT

64. Plaintiff incorporates all previous allegations as though fully set forth herein.

65. The parties entered into an oral agreement, some of the terms of which are reflected in the Purchase Agreements attached hereto, that Plaintiff would buy equipment from Defendant for $143,500.

66. Defendant, by its conduct as described herein, has breached its contract with Plaintiff.

67. As a direct and proximate result of

68. Defendant did not meet its delivery commitments to Plaintiff, including its "early January" and "end of January" dates.

69. As a direct and proximate result of Defendant's breaches, Plaintiff has suffered damages in an amount to be proven at trial.

### COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

70. Plaintiff incorporates all previous allegations as though fully set forth herein.

71. Every contract incorporates an implied duty of good faith and fair dealing.

72. Defendant, by its conduct as described herein, never intended to honor its promises to Plaintiff.

73. Defendant's breaches, including its insistence that it not be held to any reasonable delivery date (for example the date in its own advertising), goes to the core of the agreement between the parties and is material.

74. By virtue of its conduct, Defendant has breached its covenant of good faith and fair dealing with Plaintiff.

EXHIBIT A

75. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered damages in an amount to be proven at trial.

76. Defendant's conduct was willful, wanton, or reckless, such that an award of punitive damages against Defendant is appropriate.

## COUNT III: NEGLIGENT MISREPRESENTATION

77. Plaintiff incorporates all previous allegations as though fully set forth herein.

78. Defendant had a duty to be honest and avoid making material misrepresentations in its dealings with Plaintiff, including in Defendant's advertising.

79. Defendant breached that duty by making material misrepresentations to Plaintiff.

80. As a direct and proximate result of Defendant's negligence, Plaintiff has been damaged in an amount to be proven at trial.

81. Defendant's conduct was willful, wanton, or reckless such that an award of punitive damages is appropriate.

## COUNT IV: FRAUD

82. Plaintiff incorporates all previous allegations as though fully set forth herein.

83. As described herein, Defendant made material misrepresentations of fact to Plaintiff.

84. Defendant's misrepresentations, as described in this Complaint, include making misrepresentations about Defendant's ability to timely deliver quality equipment, and Defendant's efforts to hide from customers, like Plaintiff, its failures to do so by forcing complaining customers into arbitration, bullying customers into removing negative public comments about Defendant, and/or forcing aggrieved customers to sign NDAs.

85. Defendant also failed to disclose that it had no intention of timely delivering Plaintiff's equipment.

EXHIBIT A

86. Defendant also misrepresented that it was making progress on Plaintiff's equipment, when it had in fact, not even started working on Plaintiff's equipment.

87. Defendant knew, or should have known, that its misrepresentations were false when it made them.

88. Defendant made these misrepresentations with the intent to deceive Plaintiff and did deceive Plaintiff by virtue of inducing Plaintiff into sending Defendant approximately $75,000.

89. Plaintiff relied on Defendant's misrepresentations, to its detriment and has suffered damages in an amount to be proven at trial.

90. Defendant's conduct was willful, wanton, or reckless such that an award of punitive damages is appropriate.

## COUNT V: VIOLATIONS OF THE UPA

91. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

92. New Mexico has a public policy embodied in the New Mexico Unfair Trade Practices Act that prohibits companies and individuals from engaging in unfair/deceptive trade practices against New Mexico consumers.  See NMSA 1978, § 57-12-1 et seq.

93. As the result of the conduct described herein Defendant has violated the New Mexico Unfair Trade Practices act by engaging in unfair, deceptive, trade practices by engaging in conduct, including but not limited to:

      a.  Causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods and services;

      b.  Using deceptive representations or designations of geographic origin in connections with goods or services;

EXHIBIT A

   c.   Representing goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

   d.   Using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

   e.   Failing to deliver the quality or quantity of goods or services contracted for.

94. Defendant has also violated the New Mexico Unfair trade Practices Act by engaging in unconscionable trade practice as defined by the Act by taking advantage of Plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree as described herein.

95. Defendant's conduct has resulted in a gross disparity between the value received by Plaintiff and the price paid.

96.  As the result of Defendant's violations, Plaintiff is entitled to damages in the amount of treble its actual damages and attorney fees as provided in the Act.

## COUNT VI: CONVERSION

97. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

98. Plaintiff had the right of possession of personal property, its money.

99. Plaintiff demanded that the Defendant return the property to Plaintiff;

100.    Defendant refused to return the property to Plaintiff, instead has exercised dominion and control over it and converted the money to Defendant's own use.

101.    Plaintiff has been damaged by Defendant's conversion in an amount to be proven at trial.

## COUNT VII: UNJUST ENRICHMENT

102.    Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

EXHIBIT A

103.    Defendant has knowingly benefitted by virtue of keeping Plaintiff's money.

104.    Defendant has benefited in a manner that allowing Defendant to keep Plaintiff's money would be unjust.

105.    The court should grant the equitable remedy of unjust enrichment and require Defendant to return Plaintiff its money.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages, punitive damages, the costs of this action, treble damages, attorney fees, and whatever additional relief the Court may deem just and proper.

GIDDENS, GATTON, & JACOBUS, P.C.

By:  __/s/ H. Jesse Jacobus, III_____   __
     H. Jesse Jacobus, III
     Electronically filed 2.12.18
     10400 Academy NE, Suite 350
     Albuquerque, NM 87111
     505-271-1053
     505-271-4848 fax
     jjacobus@giddenslaw.com
     *Attorneys for Plaintiff*

13

EXHIBIT A

Corson Distilling Systems, Inc. • 2000 Yamhill Rd. • Boise, ID 83716 USA
Telephone: (208) 407-4268 • E-mail: info@corsondistilling.com • Website: www.corsondistilling.com





**EXHIBIT A**

Distillery Equipment • Pot Stills • Column Stills
Mash Tuns • Fermenters • Stainless Tanks • Pumps

**BILL TO:**

Donna Salas

Albuquerque
NM

# Quotation

**Valid Until: 03/30/2017**
Quote Number: 2057889000001274579

| S.No. | Product Details | Quantity | List Price | Total |
|---|---|---|---|---|
| 1. | 700 Gallon Pot Still Insulated with Whiskey and Helmet and Agitator (Steam Heated) | 1 | $ 65,000.00 | $ 65,000.00 |
| | #4 Finish | | | |
| 2. | Large Stainless Botanical Basket | 1 | $ 3,000.00 | $ 3,000.00 |
| 3. | 24" 4-Plate Column | 1 | $ 8,000.00 | $ 8,000.00 |
| 4. | 24" 10-Plate Column | 2 | $ 20,000.00 | $ 40,000.00 |
| 5. | Large Spirits Safe | 1 | $ 10,000.00 | $ 10,000.00 |
| 6. | Partial System Automation | 1 | $ 8,000.00 | $ 8,000.00 |
| 7. | Shipping TBD | 1 | $ 0.00 | $ 0.00 |

| | | |
|---|---|---|
| Sub Total | | $Quotes.Sub Total} |
| Discount | | $ 0.00 |
| **Grand Total** | | **$ 134,000.00** |

Terms and Conditions - See Attached Purchase Agreement

PURCHASE AGREEMENT

Seller: Corson Distilling Systems, Inc. Effective Date: 03/16/2017 08:39 AM
Buyer: C/O Donna Salas

1. GOODS/SERVICES AND PRICE (USD)See attached quote: 2057889000001274579
2. PAYMENT TERMS.
A 50% non-refundable deposit is due before commencement of production. The estimated build time is 24-30 weeks from the date we receive a verified deposit. We will notify you upon completion of your equipment. Payment of the additional 50% owed shall be due within five (5) business days of notice.

3. SHIPPING
We will ship your equipment within ten (10) business days of receiving a verified final payment. Please ensure your

EXHIBIT A

receiving capabilities, e.g. forklift, loading dock, etc. Buyer is responsible for all shipping fees, import costs, tariffs, duties, taxes, or any other costs associated with shipping or importation.

## 4. WARRANTY, LIMITED REMEDY, AND DISCLAIMER.

At Corson Distilling we hand-build every still, mash tun, and fermenter. As such, we proudly warrant your distilling equipment against any defects in materials and workmanship for two (2) years from the date of delivery. A defect is any failure of a component to substantially conform to the Product Specification, as provided to you, due to improper materials or subpar craftsmanship including breakage, leakage, mechanical/electrical failure, or missing parts.

We also resell support equipment including but not limited to boilers, chiller, pumps, scales, meters, lab equipment, filters, bottling and labeling equipment, and other miscellaneous support equipment. All support equipment is warranted by the original equipment manufacturer as indicated in the attached support equipment warranties.

Upon discovery of any defect, Buyer must immediately notify Seller at info@corsondistilling.com, and cease any operations relating to the defective equipment. If Seller is unable to provide a remote solution to the defect, the sole and exclusive remedy shall be repair or replacement of the equipment at Seller's discretion.

Any replacement parts assume the remaining warranty of the original part replaced.

This warranty is only to the original purchaser of the equipment from Seller, is not transferable and is further subject to the terms and conditions set forth herein. SELLER MAKES NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTY OR CONDITION ARISING OUT OF A COURSE OF DEALING, CUSTOM OR USAGE OF TRADE. PRODUCT YIELDS, QUALITY, AND RUN TIMES ARE DEPENDENT ON SEVERAL FACTORS BEYOND SELLERS CONTROL INCLUDING YEAST TYPE, FEEDSTOCK, DISTILLATION PRACTICES, SANITATION, AND ENVIRONMENTAL CONDITIONS, AND ARE NOT GUARANTEED.EXCEPT WHERE PROHIBITED BY LAW, CORSON DISTILLING SYSTEMS, INC. WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE ARISING FROM YOUR EQUIPMENT, WHETHER DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL, REGARDLESS OF THE LEGAL THEORY ASSERTED, INCLUDING WARRANTY, CONTRACT, NEGLIGENCE OR STRICT LIABILITY.

The limited warranty in this Section 4 applies only when equipment is maintained, installed and operated in accordance with the Operating Instructions accompanying the Product Specification. This limited warranty does not cover normal wear and tear, misuse, abuse or acts of God.

## 5. INDEMNIFICATION.

The Buyer shall at all times defend the Seller against all claims, actions, and lawsuits, and indemnify Seller for all damages, losses, liabilities, and expenses, including reasonable attorneys' fees, arising out of or caused by any knowing or willful breach of any of the representations, undertakings, or promises made by the Buyer under or pursuant to this Agreement, or by any negligence committed by the Buyer in the operation, maintenance, or installation of the equipment, or by the conditions of Buyer's plant and facilities.

## 6. LIMITATION OF LIABILITY.

EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY'S TOTAL LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE FEES PAID BY BUYER TO SELLER. EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF REVENUE, LOSS OF GOODWILL, ANY INTERRUPTION OF BUSINESS, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OR IS OTHERWISE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. MULTIPLE CLAIMS WILL NOT EXPAND THIS LIMITATION. THIS SECTION WILL BE GIVEN FULL EFFECT EVEN IF ANY REMEDY SPECIFIED IN THIS AGREEMENT IS DEEMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

## 7. FORCE MAJEURE.

The Seller and the Buyer shall not be considered in default hereunder or be liable for any failure to perform or delay in performing any provisions of this Agreement in the customary manner to the extent that such failure or delay is caused by any reason beyond its control, including any act of God, fire, explosion, hostilities, or war ,declared or undeclared, strike or work stoppage involving either party's employees, or governmental restrictions; provided, however, that the

EXHIBIT A

party declaring force majeure shall give prompt written notice to the other party of the commencement, nature, and termination of the force majeure condition. The party whose performance has been interrupted by such circumstances shall use every reasonable means to resume full performance of this Agreement as promptly as possible.

## 8. GOVERNING LAW AND ARBITRATION PROVISION.

The parties agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this agreement or otherwise, and any claim or dispute related to this agreement or the relationship or duties contemplated under this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure then in effect. Any award of the arbitrator(s) may be entered as a judgment in any court having jurisdiction. In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the agreement shall remain effective. Information may be obtained and claims may be filed at any office of the National Arbitration Forum, www.arbitration-forum.com, or by mail at P.O. Box 50191, Minneapolis, MN 55405. Arbitration shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16. Substantive law shall be interpreted according to the laws of the State of Idaho.

## 9. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

## 10. SEVERABILITY.

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

## 11. ENTIRE AGREEMENT.

This Agreement constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous contracts and understandings, both written and oral, between the Parties.

## 12. AFFIRMATION OF THE PARTIES.

The Parties affirm that they have entered into this Agreement freely, voluntarily, and without reliance on any promises, representations, or other statements not contained in this Agreement and have read and understood this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER Corson Distilling Systems, Inc.

Name: Josh Corson

Title: President

BUYER

_____

EXHIBIT A

Name:

Title:

>

EXHIBIT A

Corson Distilling Systems, Inc. • 2000 Yamhill Rd. • Boise, ID 83716 USA
Telephone: (208) 407-4268 • E-mail: info@corsondistilling.com • Website: www.corsondistilling.com





Distillery Equipment • Pot Stills • Column Stills
Mash Tuns • Fermenters • Stainless Tanks • Pumps

# Invoice

Invoice Number : 2057889000001804025
Invoice Date: 06/19/2017

**SELLER Electronic Payment Information:**
Wire Routing Transit Number: 121000248
International SWIFT Code: WFB1US6S
Bank Name: Wells Fargo Bank
Address: 420 Montgomery, San Francisco, CA 94104
Our Account Number: 1639952603
Title of Account: Corson Distilling Systems Inc

**BUYER:**
Hollow Spirits Distillery
Albuquerque
NM

Make Checks Payable to:
Corson Distilling Systems, Inc., 2000 Yamhill Rd., Boise ID 83716

| S.No. | Product Details | Quantity | List Price | Total |
|---|---|---|---|---|
| 1. | 400 Gallon Pot Still Insulated with Whiskey Helmet and Agitator (Steam Heated) | 1 | $ 45,000.00 | $ 45,000.00 |
| | #4 Finish | | | |
| 2. | Medium Stainless Botanical Basket | 1 | $ 2,500.00 | $ 2,000.00 |
| 3. | 18" 4-Plate Column | 1 | $ 6,000.00 | $ 6,000.00 |
| 4. | 18" 10-Plate Column | 2 | $ 15,000.00 | $ 30,000.00 |
| 5. | Medium Spirits Safe | 1 | $ 8,000.00 | $ 8,000.00 |
| 6. | Complete Process Automation | 1 | $ 16,000.00 | $ 16,000.00 |
| 7. | 400 Gallon Mash Tun insulated with Agitator and Cooling Jackets (Steam Heated) | 1 | $ 19,500.00 | $ 19,500.00 |
| | #4 Finish | | | |
| 8. | 400 Gallon Fermenter Insulated with Cooling Jacket and Agitator | 2 | $ 8,500.00 | $ 17,000.00 |
| | #4 Finish | | | |
| 9. | TTB Consulting | 1 | $ 3,000.00 | $ 0.00 |
| 10. | Installation Assistance and Training Included | 1 | $ 5,000.00 | $ 0.00 |
| 11. | Shipping TBD | 1 | $ 0.00 | $ 0.00 |

| | | |
|---|---|---|
| | Sub Total | $ 143,500.00 |
| | Discount | $ 0.00 |
| | Grand Total | $ 143,500.00 |

| | | | |
|---|---|---|---|
| 1st Deposit Due | | | |
| 1st Deposit Paid | 04/14/2017 | $ 60,250.00 | |
| 2nd Deposit Due | | | |
| 2nd Deposit Paid | | | |
| 3rd Deposit Due | | | |
| 3rd Deposit Paid | | | |

EXHIBIT A

Upgrade Deposit Due
Upgrade Deposit Paid 06/16/2017 $ **11,500.00**

Final Deposit Due                                                  $ 71,750.00
**Final Deposit Paid**

---

Deposit Due Date
Terms and Conditions - See Purchase Agreement

## Thank you for your Business!!

EXHIBIT A

Corson Distilling Systems, Inc. · 2000 Yamhill Rd. · Boise, ID 83716 USA
Telephone: (208) 407-4268 · E-mail: info@corsondistilling.com · Website: www.corsondistilling.com



Distillery Equipment · Pot Stills · Column Stills
Mash Tuns · Fermenters · Stainless Tanks · Pumps

**BILL TO:**

Hollow Spirits Distillery

Albuquerque
NM

# Quotation

Valid Until: 06/30/2017
Quote Number: 2057889000001791019

Account Name: Hollow Spirits Distillery
Contact Name: Donna Salas

Quote Stage: Draft

## 400 Gallon System

| S.No. | Product Details | Quantity | List Price | Total |
|---|---|---|---|---|
| 1. | 400 Gallon Pot Still Insulated with Whiskey Helmet and Agitator (Steam Heated) | 1 | $ 45,000.00 | $ 45,000.00 |
| | #4 Finish | | | |
| 2. | Small Stainless Botanical Basket | 1 | $ 2,000.00 | $ 2,000.00 |
| 3. | 18" 4-Plate Column | 1 | $ 6,000.00 | $ 6,000.00 |
| 4. | 18" 10-Plate Column | 2 | $ 15,000.00 | $ 30,000.00 |
| 5. | Medium Spirits Safe | 1 | $ 8,000.00 | $ 8,000.00 |
| 6. | Complete Process Automation | 1 | $ 16,000.00 | $ 16,000.00 |
| 7. | 400 Gallon Mash Tun insulated with Agitator and Cooling Jackets (Steam Heated) | 1 | $ 19,500.00 | $ 19,500.00 |
| | #4 Finish | | | |
| 8. | 400 Gallon Fermenter Insulated with Cooling Jacket and Agitator | 2 | $ 8,500.00 | $ 17,000.00 |
| | #4 Finish | | | |
| 9. | TTB Consulting | 1 | $ 3,000.00 | $ 0.00 |
| 10. | Installation Assistance and Training Included | 1 | $ 5,000.00 | $ 0.00 |
| 11. | Shipping TBD | 1 | $ 0.00 | $ 0.00 |
| | | | Sub Total | $ 143,500.00 |
| | | | Discount | $ 0.00 |
| | | | Grand Total | $ 143,500.00 |

Terms and Conditions - See attached Purchase Agreement

## PURCHASE AGREEMENT

FH

Seller: Corson Distilling Systems, Inc. Effective Date: 06/14/2017 01:35 PM
Buyer: Donna Salas C/O Hollow Spirits Distillery

EXHIBIT A

**1. GOODS/SERVICES AND PRICE.**

See attached quote: 2057889000001791019

**2. PAYMENT TERMS.**

A 50% non-refundable deposit on your order is due prior to commencement of design, ordering materials and production set up. The estimated build time is 24-30 weeks from production setup. We will notify you upon completion of your order and final pictures will be sent to you with a final invoice. Payment of the additional 50% owed plus shipping and handling fees shall be due within five (5) business days of the final invoice.

The timeframe for the completion of your order is an estimate and we take pride in the craftsmanship and quality that your order requires. We strive to improve completion times, however, we may need to adjust them from time to time in order to make requested changes, or improvements on the systems as seller sees fit.

**3. SHIPPING/INSTALLTION SUPPORT/TRAINING.**

We will ship and assist in the installation of your equipment on a mutually agreed upon date, but only after receiving a verified final payment and verification that all support systems are installed and ready for connection to your distilling system. Any undue delays caused by buyer in receiving equipment may result in storage fees. Please ensure installation of all support equipment such as boilers (low pressure under 15psi), chillers, electrical systems, and any other systems that we may request of you prior to the delivery date to facilitate proper installation and training. You will be responsible for the payment for these support systems. Installation shall include assisting you or your staff in erecting your columns, and verification that all tanks are level. A plumber, electrician, and HVAC technician must connect the distilling system to your heating, cooling, and electrical systems prior to our technician's arrival. You are responsible for fees associated with installation support services. You are also responsible for obtaining a fork lift, scissor lift, and ladders for use during installation. Training does not include mashing, live fermentation, or distillation of ethanol, but is limited to training on equipment operations. The technician may run the still during training with water only, if all support systems are completely installed. You are responsible for providing a safe working environment as required by local, state, and federal regulations.

**4. WARRANTY, LIMITED REMEDY, AND DISCLAIMER.**

At Corson Distilling we hand-build every piece of equipment. As such, we proudly warrant your equipment against any defects in materials and workmanship for two (2) years from the date of delivery. A defect is any failure of a component to substantially conform to the Product Specification, as provided to you, due to improper materials or subpar craftsmanship including breakage, leakage, mechanical/electrical failure, or missing parts.

Upon discovery of any defect, Buyer must immediately notify Seller at info@corsondistilling.com, and cease any operations relating to the defective equipment. If Seller is unable to provide a remote solution to the defect, the sole and exclusive remedy shall be repair or replacement of the equipment at Seller's discretion. Buyer must return defective equipment to seller within 5 business days of Sellers request for return.

Any replacement parts assume the remaining warranty of the original part replaced.

We also resell support equipment including but not limited to boilers, chiller, pumps, scales, meters, lab equipment, filters, bottling and labeling equipment, and other miscellaneous support equipment. All support equipment is warranted by the original equipment manufacturer as indicated in the attached support equipment warrantics.

This warranty is only to the original purchaser of the equipment from Seller, is not transferable and is further subject to the terms and conditions set forth herein. SELLER MAKES NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTY OR CONDITION ARISING OUT OF A COURSE OF DEALING, CUSTOM OR USAGE OF TRADE. PRODUCT YIELDS, QUALITY, AND RUN TIMES ARE DEPENDENT ON SEVERAL FACTORS BEYOND SELLERS CONTROL INCLUDING YEAST TYPE, FEEDSTOCK, DISTILLATION PRACTICES, SANITATION, AND ENVIRONMENTAL CONDITIONS, AND ARE NOT GUARANTEED. EXCEPT WHERE *FH*

EXHIBIT A

PROHIBITED BY LAW, CORSON DISTILLING SYSTEMS, INC. WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE ARISING FROM YOUR EQUIPMENT, WHETHER DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL, REGARDLESS OF THE LEGAL THEORY ASSERTED, INCLUDING WARRANTY, CONTRACT, NEGLIGENCE OR STRICT LIABILITY.

The limited warranty in this Section 4 applies only when equipment is maintained, installed and operated in accordance with the Operating Instructions accompanying the Product Specification. This limited warranty does not cover normal wear and tear, misuse, abuse or acts of God.

### 5. INDEMNIFICATION.

The Buyer shall at all times defend the Seller against all claims, actions, and lawsuits, and indemnify Seller for all damages, losses, liabilities, and expenses, including reasonable attorneys' fees, arising out of or caused by any knowing or willful breach of any of the representations, undertakings, or promises made by the Buyer under or pursuant to this Agreement, or by any negligence committed by the Buyer in the operation, maintenance, or installation of the equipment, or by the conditions of Buyer's plant and facilities.

### 6. LIMITATION OF LIABILITY.

EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY'S TOTAL LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE FEES PAID BY BUYER TO SELLER. EXCEPT FOR EACH PARTY'S INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF REVENUE, LOSS OF GOODWILL, ANY INTERRUPTION OF BUSINESS, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OR IS OTHERWISE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. MULTIPLE CLAIMS WILL NOT EXPAND THIS LIMITATION. THIS SECTION WILL BE GIVEN FULL EFFECT EVEN IF ANY REMEDY SPECIFIED IN THIS AGREEMENT IS DEEMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

### 7. FORCE MAJEURE.

The Seller and the Buyer shall not be considered in default hereunder or be liable for any failure to perform or delay in performing any provisions of this Agreement in the customary manner to the extent that such failure or delay is caused by any reason beyond its control, including any act of God, fire, explosion, hostilities, or war, declared or undeclared, strike or work stoppage involving either party's employees, or governmental restrictions; provided, however, that the party declaring force majeure shall give prompt written notice to the other party of the commencement, nature, and termination of the force majeure condition. The party whose performance has been interrupted by such circumstances shall use every reasonable means to resume full performance of this Agreement as promptly as possible.

### 8. GOVERNING LAW AND ARBITRATION PROVISION.

The parties agree that any claim or dispute between them or against any agent, employee, successor, or assign of the other, whether related to this agreement or otherwise, and any claim or dispute related to this agreement or the relationship or duties contemplated under this contract, including the validity of this arbitration clause, shall be resolved by binding arbitration by the National Arbitration Forum, under the Code of Procedure then in effect. Any award of the arbitrator(s) may be entered as a judgment in any court having jurisdiction. In the event a court having jurisdiction finds any portion of this agreement unenforceable, that portion shall not be effective and the remainder of the agreement shall remain effective. Information may be obtained and claims may be filed at any office of the National Arbitration Forum, www.arbitration-forum.com, or by mail at P.O. Box 50191, Minneapolis, MN 55405. Arbitration shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Sections 1-16.Substantive law shall be interpreted according to the laws of the State of Idaho.

### 9. COUNTERPARTS/ELECTRONIC SIGNATURES.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of *FH*

EXHIBIT A

which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail, or other electronic medium shall have the same force and effect as an original signature.

### 10. SEVERABILITY.

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provisions had never been contained herein.

### 11. ENTIRE AGREEMENT.

This Agreement constitutes the final, complete, and exclusive statement of the agreement of the Parties with respect to the subject matter hereof, and supersedes any and all other prior and contemporaneous contracts and understandings, both written and oral, between the Parties.

### 12. AFFIRMATION OF THE PARTIES.

The Parties affirm that they have entered into this Agreement freely, voluntarily, and without reliance on any promises, representations, or other statements not contained in this Agreement and have read and understood this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER Corson Distilling Systems, Inc.
Name: Josh Corson
Title: President

BUYER

Name: Frank Holloway
Title: CEO

EXHIBIT A



EXHIBIT A



A. DIMPLED COOLING JACKET.
B. BALL VALVE DRAIN (4 INCH) FERRULE.
C. STAINLESS STEEL LEGS, W/ADJUSTABLE FEET.
D. PRESSURE & VACUUM RELIEF.
E. THERMOMETER(1/2" NPT).
F. GLYCOL OUTLET (3/4" NPT).
G. GLYCOL INLET (3/4" NPT).
H. FLUID LEVEL GAUGE.
I. 18" MANWAY TOP ACCESS.
J. THERMOWELL (1/2" NPT).
K. ACCESSORY PORT (4 INCH) FERRULE.
L. 400 GALLON LIQUID LEVEL.
M. HOIST HOOKS.
N. CIP BALL VALVE PRESSURE GAUGE(3/4" NPT).
O. FILL PORT (4 INCH) FERRULE.
P. INSULATION (2 INCH).
Q. STAINLESS STEEL SHELL.
R. 1 1/2 HP 3PH, 220V AGITATOR W/GEAR.
DRIVE REDUCTION.
S. F&T STEAM TRAP (3/4" NPT).
T. STEAM INLET PORT (1 1/2" NPT).
(SPECIFY LOCATION: BACK-RIGHT-LEFT).
U. STEAM CHAMBER.
V. SPARGING ARM AND WATER INLET.
W. PIPING(3/4" NPT).
X. MANWAY FRONT ACCESS.
REMOVABLE FALSE BOTTOM(3 PIECES).

NOTE:
1. VFD INCLUDED, NOT SHOWN 1 1/2HP IN 220V 3PH OUT 10-88 RPM.
2. ENCLOSURES NOT INCLUDED.

UNLESS OTHERWISE SPECIFIED:
DIMENSIONS ARE IN INCHES
INTERPRET GEOMETRIC TOLERANCING PER:
MATERIAL STAINLESS 304
FINISH #4
DO NOT SCALE DRAWING

| | NAME | DATE |
|---|---|---|
| DRAWN BY | ADG | 04/19/16 |
| CHECKED BY | EDISON | 08/24/16 |
| COOL | | 400,000 BTU |
| COOLING FLOWRATE | | 35 GPM @ 65° INLET |
| HEATING | | 400,000 BTU |
| HEATING FLOWRATE | | 400 LBS/HR |

TITLE
400 GALLON MASH TUN
(WITH LAUTERING OPTION)

SIZE **A**  DWG. NO. 400 GAL. MASH TUN  REV **A**

SCALE: 1:32  WEIGHT:  SHEET 1 OF 1

PROPRIETARY AND CONFIDENTIAL

THE INFORMATION CONTAINED IN THIS DRAWING IS THE SOLE PROPERTY OF CORSON DISTILLING SYSTEMS, INC. ANY REPRODUCTION IN PART OR AS A WHOLE WITHOUT THE WRITTEN PERMISSION OF CORSON DISTILLING SYSTEMS, INC. IS PROHIBITED.

CORSON DISTILLING SYSTEMS, INC.
WWW.CORSONDISTILLING.COM



A. DIMPLED COOLING JACKET.
B. BALL VALVE DRAIN (4 INCH) FERRULE.
C. STAINLESS STEEL LEGS.
   W/ADJUSTABLE FEET.
D. PRESSURE & VACUUM RELIEF.
E. THERMOMETER (1/2" NPT).
F. GLYCOL OUTLET (3/4" NPT).
G. GLYCOL INLET (3/4" NPT).
H. FLUID LEVEL GAUGE.
I. 18" MANWAY TOP ACCESS.
J. THERMOWELL (1/2" NPT).
K. 400 GALLON LIQUID LEVEL.
L. HOIST HOOKS.
M. CIP BALL VALVE PRESSURE GAUGE AND CO2
   VENT (3/4" NPT).
N. FILL PORT (4 INCH) FERRULE.
O. INSULATION (2 INCH).
P. STAINLESS STEEL SHELL.
Q. 1 HP 3PH, 220V AGITATOR.
   W/GEAR DRIVE REDUCTION.

NOTE:

1. VFD INCLUDED, NOT SHOWN 1 HP IN 220V 3PH OUT 10-88 RPM.
2. ENCLOSURE NOT INCLUDED.

TITLE:
400 GALLON FERMENTER
(WITH AGITATOR)

| | SIZE | DWG. NO. | | REV |
| | A | 400 GAL FERMENTER | | B |
| | SCALE: 1:30 | WEIGHT: | | SHEET 1 OF 1 |

PROPRIETARY AND CONFIDENTIAL

EXHIBIT A

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SELLER Corson Distilling Systems, Inc.
Name: Josh Corson
Title: President


BUYER
Name: Frank Holloway
Title: CEO

EXHIBIT A

2/12/2018

http://www.idahostatesman.com/news/business/article187541748.html

Idaho distillery equipment maker sued over defects, delays | Idaho Statesman

1/12

BUSINESS

# Distillers across country accuse Boise business of breaking contracts



EXHIBIT C

EXHIBIT A

2/12/2018

http://www.idahostatesman.com/news/business/article187541748.html

Idaho distillery equipment maker sued over defects, delays | Idaho Statesman

**BY AUDREY DUTTON**
*adutton@idahostatesman.com*

December 01, 2017 11:18 AM
Updated December 06, 2017 05:43 AM

Distilleries from around the country are accusing a Boise business of breaking promises and wasting their money.

Corson Distilling Systems has been sued by at least four distilleries in the past 13 months.

The lawsuits, all with some similarities, say Corson failed to produce working equipment — or in some cases, any equipment — after customers paid them. Combined, the customers and their attorneys blame Corson for at least $500,000 in losses and damages, and the deaths of two pet cats.

ADVERTISING

inRead invented by Teads

EXHIBIT A

"What I'm trying to do is just have my money returned," said Larry Forrest, owner of Ghost Hollow Distillery in Illinois. "Nothing was ever delivered to me, nothing was ever received. … If they're not willing to return my money, where is that money?"

## Latest news by email

This afternoon's latest local news

Enter Email Address

SIGN UP

The Corson brothers declined through their attorney to be interviewed, instead providing a prepared statement: "We are aware of and respectful of, the concerns of our customers. Corson Distilling Systems stands by its products and prefers to work out any issues and legal claims in a court of law, not in the court of public opinion."

The Corsons and their attorney also did not respond to an emailed list of questions about the lawsuits, other complaints and Corson's business practices.

In court, the company has denied some of the allegations. But its main strategy has been to argue that its contract requires disputes to be handled in arbitration, outside of court and outside of public view. As a result, it has not responded to some of the claims in public court filings.

## Corson in the spotlight

Corson Distilling was founded by local brothers Tory and Josh Corson, who previously worked in law and real estate but had a passion for spirits and distilling.

http://www.idahostatesman.com/news/business/article187541748.html

EXHIBIT A

http://www.idahostatesman.com/news/business/article187541748.html

Boise Mayor David Bieter lauded the company in his 2016 State of the City address, calling the business "one of the top four still makers on the planet, with revenue of around $6 million and 42 employees."

"Tory and Josh embody the entrepreneurial spirit that Boise is known for," Bieter added.

Shortly after, the Idaho Statesman published a profile of the business. The company was growing fast, the Statesman reported. Corson made Boise one of the few places where the booming distillery sector could find American-made equipment. And the turnaround time it advertised — four to five months — was enticing. It could take twice as long, or more, to get systems from other manufacturers.

"The Corsons thought they could underprice the competition," the September 2016 story reads. "They knew the demand was there, as craft distilling is taking off the way craft brewing did five years ago. So they took their freshly built copper-and-steel equipment, made it the gleaming centerpiece of their website and waited as Google searches brought them customers."

Many of the customers who ordered from Corson Distilling were, like them, small businesses and startups. They wanted Corson's gleaming stainless-steel and copper stills, whiskey and vodka columns, mash tuns and other pieces of liquor machinery to be the centerpieces of their new or growing distilleries.

At the time, Corson was just a couple of years old. But already, former customers allege, the company had begun falling short of its obligations.

In addition to the four lawsuits, distillers from outside Idaho have posted to social media and an industry forum about lengthy delays and equipment problems.

The owner of a Kansas distillery ordered a system from Corson in early 2015. The equipment arrived five months later than expected — in November 2015 — but didn't function until Corson made repairs in June 2016, said Hayes Kelman, the distiller. It still doesn't work as well as it should, he said.

2/12/2018

http://www.idahostatesman.com/news/business/article187541748.html

Idaho distillery equipment maker sued over defects, delays | Idaho Statesman



The short turnaround time Corson advertised "was a huge part" of the reason Kelman ordered from the Boise company, he told the Statesman. "You look at other manufacturers, you're way out. You might even be on the list for a year before it goes into production. For us, that [short turnaround] was very attractive."

## 'Paid ... for, literally, nothing'

One of Corson's early customers was a San Francisco distillery, located in a former naval firehouse on the city's Treasure Island. It's now been two years since Treehouse Craft Distillery signed a contract with Corson, and it is in the process of settling a lawsuit against the company.

Treehouse and Corson signed a deal in November 2015. Treehouse paid Corson its deposit — $69,500 — over the next few months. Corson said the equipment would be finished in spring 2016, the lawsuit says. Treehouse sent the rest of its payment, another $78,000, in May.

"This payment was made early, in good faith, and with the understanding that the equipment would be delivered and installed by the end of May 2016 or early June 2016," Treehouse said in its lawsuit.

The day after making that final payment, a Corson employee told Treehouse the system would be installed in San Francisco in mid-June. But nothing showed up all summer, according to the lawsuit.

Treehouse's lawyer sent Corson a letter in late September 2016 saying it had breached the contract and must refund the $151,000 that Treehouse "paid to Corson Distilling for, literally, nothing."

The companies began to fight over who was responsible for the delays — and whether Treehouse was obligated to accept the equipment on Corson's terms. The distillery sued Corson in October 2016 in 4th District Court in Ada County.

Then, Corson had good news: The system was ready.

EXHIBIT A

2/12/2018

Idaho distillery equipment maker sued over defects, delays | Idaho Statesman

http://www.idahostatesman.com/news/business/article187541748.html

This Idaho Statesman video was shot in September 2016. The company, Corson Distilling Systems, had hired its first employee in January 2015. It grew to employ about 50 people and had 55 customers as of Sept. 12. That year, Corson said it was on track for $8 million in sales, more than four times its 2015 sales, with a 50 percent profit margin on equipment. Kyle Green — kgreen@idahostatesman.com



Treehouse's owner and lawyer showed up at the Boise factory on Nov. 4, 2016, to see it in person. They had "significant quality concerns" about the equipment, and whether Corson had actually built it or had bought it from another manufacturer and "slapped its name on it," Treehouse says. But the distillery agreed to take the equipment as long as it could be delivered within

EXHIBIT A

2/12/2018

Idaho distillery equipment maker sued over defects, delays | Idaho Statesman

http://www.idahostatesman.com/news/business/article187541748.html

7/12

two weeks.

The equipment arrived at Treehouse later that month — with problems, Treehouse says, such as "numerous missing components" and none of the serial numbers "required by various regulatory agencies."

Corson in court denied Treehouse's claims, saying Treehouse has crafted a "winding and grossly misleading narrative," with a "multitude of misleading and blatantly false 'facts.' "

Corson says the distillery's owner failed to tell Corson about a big modification to the original still plans until four months into production. That required Corson to redesign, re-engineer and rebuild the system, it claimed.

"Once Corson did deliver the still to Treehouse's facility, the Corson installation team found that Treehouse's facility was not in compliance with federal regulations," Corson told the court. "Finally, Mr. Byerly inexplicably refused to allow Corson's installation team to fully set up and test the still."

It's unclear what happened with the lawsuit. The judge approved Corson's request to address the matter in arbitration.

## A year and 'nothing to show for it'

Larry Forrest wanted Corson to build the equipment for Ghost Hollow Distillery after seeing the company's website — "American made, quality equipment, 16- to 20-week lead time" and help with the whole process — and then after talking with Tory Corson.

So in October 2015, he sent a $10,000 down payment. He sent the rest of the deposit — $104,125 — the following July. Based on the estimated build time in the contract, Forrest expected his shiny new equipment to arrive around Thanksgiving 2016.

But, according to the lawsuit, Forrest flew someone to Boise in February 2017 to check on the progress and found that Corson had yet to start work.

"Mr. Forrest has now paid a total of $114,125 to your company and has nothing to show for it," said a letter Ghost Hollow's lawyer sent to Corson this March.

EXHIBIT A

http://www.idahostatesman.com/news/business/article187541748.html

Ghost Hollow sued Corson in June in Adams County, Illinois. Corson had until Friday, Dec. 1, to respond to the allegations in court.

"After this much delay, I just want my money back so I can move on," Forrest told the Statesman.

Another distillery sued in May. Florida-based Grindstone Distillery said it paid Corson a $73,000 deposit in October 2016 for a 500-gallon system. Corson refused to refund the money days later, after the two businesses failed to agree on the terms of a contract, the lawsuit says.

Corson in reply suggested the two companies did indeed reach a purchase agreement, but that it doesn't have a copy of the paperwork. That case is scheduled for a two-day trial next August.

"My concern is this client paid this deposit, and that deposit is going to disappear into a black hole," said Richard J. Armstrong, an attorney at Kirton McConkie in Lehi, Utah, who is representing Grindstone.

## Lost profits, lost pets

Adam Stumpf and his wife started Stumpy's Spirits in the barn on his family's farm in Illinois. Stumpy's is a "farm to table" distillery, using grain grown on the farm to make whiskey and vodka. Within six months, it had outgrown its still and needed a big upgrade.

Stumpy's hired Corson in January 2016 to build a 500-gallon, steam-heated, custom pot still and other equipment. The company wired Corson a total of $125,000 by March 2016.

Stumpy's received the equipment in February and March 2017, seven or eight months after it was supposed to arrive, Stumpf said.

In the meantime, he had honored a contract he made with another distiller to sell an older still he thought he no longer needed. With no new still yet in November, Stumpf bought a 75-gallon still from a Chicago source as a stopgap measure until Corson came through.

EXHIBIT A

2/12/2018                                                                                                                   Idaho distillery equipment maker sued over defects, delays | Idaho Statesman

Stumpy's sued Corson in Illinois in July. The lawsuit also alleges Corson's equipment was "defectively designed and manufactured ... not fit for its ordinary purposes." For example, it had no pressure gauges, its pressure-relief valve was inadequate and the pot-still hatch didn't work as it should, Stumpy's said.

Stumpy's attorney Lawrence B. Wittels said the problems continue to mean the stills aren't distilling liquor as efficiently as they should.

Soon after the equipment arrived, it exploded during use, Wittels said. The hatch blew off, he said, and the 500-gallon still erupted into a geyser of 180-degree liquid.

"There was what was basically corn and barley oatmeal plastered to the ceiling — that was the force of the explosion," Wittels said. The ceiling is 23 feet high, he said.

"The explosion happened the first time we actually ran a full grain mash," Stumpf told the Statesman. "About 250 gallons of that 180-degree liquid blew out and covered the entire front half of the distillery. It coated the ceiling, it coated the barrels."

When the scalding mash came back down to the ground, it fell onto Stumpf's back as he dove away from the explosion. It also landed on two pet cats that lived in the distillery, Whiskey and Riesling. Whiskey lived a few days before succumbing to the burns, and Riesling lived a little while longer but eventually died from the burns, Wittels said.

The cats' deaths were "certainly emotionally one of the hardest things," Stumpf said. "They were quite the characters."

After repairs to address the explosion's cause, the still remains in use.

Stumpy's is suing Corson on nine different counts. Wittels said his client's damages are probably close to $300,000 due to months of lost profits, damage from the explosion, further needed repairs and other expenses.

*Audrey Dutton: 208-377-6448, @audreydutton*

http://www.idahostatesman.com/news/business/article187541748.html

EXHIBIT A