UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

HOLLOW SPIRITS, LLC,

     Plaintiff,

v.                                                                   No. 1:18-cv-00257-KK-JHR

CORSON DISTILLING SYSTEMS, INC.,
TORY CORSON, and JOSH CORSON

     Defendant.

**FIRST AMENDED COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff Hollow Spirits, LLC ("Hollow Spirits"), by and through its

counsel of record, Freedman Boyd Hollander Goldberg Urias & Ward P.A. (H. Jesse Jacobus, III),

and, for its First Amended Complaint for Damages against Corson Distilling Systems, Inc.

("Corson"), Tory Corson, and Josh Corson, hereby states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, Hollow Spirits, is a domestic Limited Liability Company with its principal place of

   business in Bernalillo County, New Mexico.

2. Defendant Corson, is a foreign corporation with its principal place of business in Boise, Idaho.

3. Defendant Corson knew, or should have known, that it was doing business with a New Mexico

   company at all material times.

4. Upon information and belief, Defendant Corson has done business in New Mexico prior to

   selling a still to Plaintiff.

5. Specifically, Corson had recently sold a still to Glencoe Distillery, LLC, which is located in

   Ruidoso, New Mexico.

6.  On information and belief, Defendants Tory Corson and Josh Corson are the owners and operators of Defendant Corson at all times relevant to the Amended Complaint.

7.  Defendants Tory and Josh Corson incorporated Defendant Corson as a business for the purpose of perpetrating a fraud and not for any proper purpose.

8.  Venue in this Court is proper.

9.  Either by virtue of doing business in New Mexico with Plaintiff and/or by virtue of doing business with Plaintiff and having also done business in New Mexico with Glencoe Distillery, LLC, Defendants have met the requirements of New Mexico's Long Arm Statute, NMSA 1978 § 38-1-16(A), *et seq* such that jurisdiction is proper in this Court.

## FACTS COMMON TO ALL COUNTS

10. Plaintiff incorporates all previous allegations as though fully set forth herein.

11. In March of 2017, Plaintiff was in the process of opening an Albuquerque craft distillery and was in the market for a still.

12. Plaintiff's target date to open its distillery was March 2018.

13. Corson's advertising materials, including its website and "YouTube" videos, emphasized the fact that Corson was an American manufacturer, which was attractive to Plaintiff.

14. Plaintiff also reviewed Corson's YouTube advertising videos, specifically, a video located at https://www.youtube.com/watch?v=nBKrFxkdY1Q, which was two minutes and forty three seconds in length.

15. In that video, one of Corson's owners, Tory Corson, expressly stated that: "the difference at Corson's is that we focused our entire company on the startup craft distilling industry. So all the stuff those guys don't offer, we added it. It has gone a long way towards helping our

customers get off the ground faster and more affordably than if they'd bought from one of our competitors."

16. This representation by Defendant Tory Corson attracted Plaintiff to do business with Corson because Plaintiff was, and is, a startup craft distilling business.

17. Also in the video, Corson's other owner, Josh Corson expressly stated "The cool part about it is now we get to help lots of craft distilleries start distilleries. So instead of having our own distillery, we have lots of distilleries."

18. This representation by Defendant Josh Corson further attracted Plaintiff to do business with Corson because Plaintiff understood this representation to mean that Defendants understood the needs of startup distilleries and were attentive to customer needs, including responsiveness to questions and timely delivery of a quality product.

19. In another YouTube video, located at https://www.youtube.com/watch?v=01e3FUDIzwo, Defendant Tory Corson further represented that Corson was on its way to "becoming the global leader in distillery equipment." Plaintiff understood this to be a further representation of Defendants' commitment to quality, timely, attentive, and communicative delivery of a good quality still.

20. Plaintiff viewed Defendants' website which advertised that the "CURRENT BUILD TIME" for its stills was "24-30 WEEKS." In Plaintiff's estimation, that would have left ample time for construction, delivery, installation, and testing of the new still, well in advance of Plaintiff's target opening date.

21. Plaintiff also conducted internet research for negative feedback about Defendant Corson. Plaintiff found none. Upon information and belief, Plaintiff believes it did not find negative feedback on Corson with regard to late delivery of stills, poor workmanship, and or failure to

deliver stills at all because Defendants engaged in a pattern and practice of threatening customers it had mistreated into removing such comments.

22. In addition, Corson as a part of its fraudulent business model, included arbitration clauses in its contracts, and insisted that customers with whom it had a dispute, sign Non-Disclosure Agreements ("NDAs") as a way of keeping Corson's many failures from becoming public, and sweeping them under the rug.

23. Corson's YouTube videos do not state that it requires all customers to sign a contract that contains language stating that Corson is not bound to deliver any still by any particular date.

24. Corson's YouTube Videos do not state that it will routinely refuse to give a customer a firm delivery date and make the excuse that it cannot do so because it "custom builds" the stills and because, in Corson's view, copper is so difficult to work with that it is impossible to guarantee any firm delivery date.

25. Corson's website advertisement does not state customers should not rely on Corson's "CURRENT BUILD TIME" of "24-30 WEEKS" and/or that Corson cannot, and has routinely failed to meet delivery dates for its customers.

26. Plaintiff decided to do business with Corson because of the absence of negative comments about the company, and because Corson offered an American-made product, from a company that focused on startups, with a build time that was faster than competitors, at a lower price.

27.  On March 16, 2017, Plaintiff received an initial quote for equipment, including a 700-gallon pot still, from Corson of $134,000.

28. During a telephone conversation, Tory Corson stated that after Plaintiff paid its deposit, Corson would provide Plaintiff with access to its engineers who could answer any specific technical questions Plaintiff had.

29. The deposit Corson required was one half of the full purchase price.

30. On March 30, 2017 Corson corrected its original quote to $120,500.

31. On April 6, 2017, Plaintiff requested that Corson provide a detailed list of items included with the purchase price to which Tory Corson responded: "We don't have a list until it ships and we include the packing list, but the schematics show everything that comes with our equipment."

32. On April 14, 2017, Plaintiff wired $60,250.00 to Corson which represented one-half of the originally quoted price of $120,500.

33. At no time prior to receiving Plaintiff's wired money did Corson employees tell Plaintiff, via email, or telephone conversation, that it could not meet **any** set delivery date whatsoever, due to alleged difficulties in working with copper.

34. On April 17, 2017, Plaintiff asked Corson to provide detailed documents showing the parts, pieces, attachments, and piping that consisted of Plaintiff's order.  Plaintiff further requested a user manual showing how to use the equipment and contact information for Corson's engineering department who could answer Plaintiff's questions.

35. Tory Corson responded "Absolutely! I will have our project managers info. Shortly, when they are assigned. In the meantime, I can schedule a call with the engineering department whenever your team is ready. Also, I have them working on your list as well!"

36. On April 20, 2017, Tory Corson again told Plaintiff "engineering is working on your list. Just wanted you to know we didn't forget."

37. Despite making these promises, representations, and assurances, Corson has never provided Plaintiff with the name of the project manager, put Plaintiff in touch with Corson's engineering department, or provided Plaintiff with a parts list.

38. On April 21, 2017, Plaintiff signed a written "Quotation" and "Purchase Agreement" attached hereto as Exhibit A.

39. At the time Plaintiff signed this document, because it had already wired its money to Defendant, Plaintiff did not notice that the purported Quote and Purchase Agreement contained language that purported to: eliminate any obligation for Corson to deliver the equipment consistent with its advertised build time of "24-30 WEEKS", limit damages for failure to timely deliver or anything else to the fee paid for the equipment, and compel arbitration.

40. Due to the representations made in Corson's advertising, Plaintiff expected delivery of its equipment in "24-30 WEEKS", which would have been approximately late October or early November 2017.

41. On June 8, 2017, Tory Corson again promised to provide updates on Plaintiff's order "as it moves through each stage, we will update you and provide the documentation needed." Corson never provided any such updates.

42. On June 14, 2017, Plaintiff advised Corson that it needed to change its order. Instead of a 700-gallon system, Plaintiff was requesting a 400-gallon system. However, Plaintiff added a mash tun and two fermenters to the order which increased the purchase price to $143,500.

43. On June 16, 2017, Plaintiff wired Defendant an additional $11,500 which, along with the money Plaintiff had already paid, represented the down payment of 50% of the new price of $143,500.

44. Plaintiff also signed a new "Quote." See Exhibit B.

45. Prior to receiving Plaintiff's additional money, Corson never told Plaintiff that any of its requested changes would result in a longer build time.

46. However, even if Defendants had not done anything in the previous nearly two-months since Plaintiff made its original down payment, pursuant to Defendants' advertised "24-30 WEEKS"

build time, Plaintiff's equipment should have been completed between November 29, 2017 and January 10, 2018, at the latest.

47. Subsequent to receiving Plaintiff's money, Defendants refused to provide any detailed updates, confirm any completion date, or communicate effectively with Plaintiff's requests for information.

48. It was not until August 11, 2017, that Tory Corson stated, in writing, that Plaintiff's changes "can and does move the initial estimated time of completion."

49. Defendant also refused to permit Plaintiff to go to Boise, at Plaintiff's expense, to inspect the still before tendering another $75,000.

50. On September 1, 2017, Plaintiff expressly told Defendant that construction on its build out was scheduled to begin in seven (7) weeks, so time is of the essence.

51. Tory Corson again refused to provide any update, or answer any substantive questions, claiming "September is very busy for everyone."

52. On September 29, 2017, in response to another inquiry from Plaintiff the day before, Tory Corson confirmed that "Your build is moving right along. The estimated date of completion remains the same…"

53. On October 23, 2017, Tory Corson finally confirmed that "The estimated date of completion is at the first part of January.  I will have more specifics as we get closer."

54. On November 9, 2017, Tory Corson again confirmed in writing that "Everything is moving right along in production with no changes at this time." By this time, Corson had ignored several requests from Plaintiff that it provide photographs of Plaintiff's equipment showing any progress.

55. After failing to respond to written requests for updates (or photographs) from Plaintiff, on December 6, 2017, Defendant finally wrote Plaintiff stating "Your estimated date of completion has moved a little from mid-January to the end of January…"

56. Defendant gave no reason for this change.

57. During the month of December 2017, Defendants refused to answer questions as to why the delivery date had changed, or what issues caused the delay, or responding to Plaintiff's request to inspect its equipment before making the final payment.

58.   On December 14, 2017, Tory Corson wrote Plaintiff stating that it would not permit Plaintiff to inspect its equipment and for the first time, claimed that pursuant to the Purchase Agreement, "This time frame is an estimate and not a guarantee."

59. In December 2017, Plaintiff became alarmed when it learned, through an Idaho Statesman article, that Defendant had been sued by several customers for taking money and delivering equipment late, not delivering equipment at all, and/or failing to deliver equipment that work properly. See Exhibit C (article).

60. In addition, Plaintiff also learned through a separate source, that one of the Corson customers that received late and/or non-functional equipment from Defendant was Glencoe Distillery in Ruidoso, NM.

61. Upon information and belief, Defendants have engaged in a pattern and practice of taking money from customers, including other New Mexico customers, and failing to deliver products timely, and/or of appropriate workmanlike quality.

62. When those customers complained, Defendants engaged in a pattern and practice of pointing to its grossly unfair and unconscionable Purchase Agreements as an excuse for its failure to meet its own advertised deadlines and poor craftsmanship.

63. Defendants have been successful in continuing to fool customers by sweeping its own fraudulent conduct under the rug by either compelling arbitration, or requiring wronged customers to sign "NDAs."

64. Defendants did not meet their "early January" and "end of January" delivery commitments to Plaintiff.

65. Despite Plaintiff's written demand, Defendants have refused to return Plaintiff's money.

## COUNT I: BREACH OF CONTRACT

66. Plaintiff incorporates all previous allegations as though fully set forth herein.

67. The parties entered into an oral agreement, some of the terms of which are reflected in the Purchase Agreements attached hereto, that Plaintiff would buy equipment from Defendant Corson for $143,500.

68. Defendant Corson, by its conduct as described herein, has breached its contract with Plaintiff.

69. Defendant Corson did not meet its delivery commitments to Plaintiff, including its "early January" and "end of January" dates.

70. As a direct and proximate result of Defendant Corson's breaches, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

71. Plaintiff incorporates all previous allegations as though fully set forth herein.

72. Every contract incorporates an implied duty of good faith and fair dealing.

73. Defendant Corson, by its conduct as described herein, never intended to honor its promises to Plaintiff.

74. Defendant Corson's breaches, including its insistence that it not be held to any reasonable delivery date (for example the date in its own advertising), goes to the core of the agreement between the parties and is material.

75. By virtue of its conduct, Defendant Corson has breached its covenant of good faith and fair dealing with Plaintiff.

76. As a direct and proximate result of Defendant Corson's conduct, Plaintiff has suffered damages in an amount to be proven at trial.

77. Defendant Corson's conduct was willful, wanton, or reckless, such that an award of punitive damages against Defendant is appropriate.

## COUNT III: NEGLIGENT MISREPRESENTATION

78. Plaintiff incorporates all previous allegations as though fully set forth herein.

79. Defendants, including individual Defendants,[1] had a duty to be honest and avoid making material misrepresentations in its dealings with Plaintiff, including in Defendant's's advertising.

80. Defendants breached that duty by making material misrepresentations to Plaintiff.

81. As a direct and proximate result of Defendants' negligence, Plaintiff has been damaged in an amount to be proven at trial.

82. Defendants' conduct was willful, wanton, or reckless such that an award of punitive damages is appropriate.

## COUNT IV: FRAUD

83. Plaintiff incorporates all previous allegations as though fully set forth herein.

---

[1] Pursuant to *Ettenson v. Burke*, 2001-NMCA-003, individual defendants can be personally liable for torts even though they are also corporate officers, if they act in bad faith and not in the corporation's best interests.

84. As described herein, Defendants, including individual Defendants, made material misrepresentations of fact to Plaintiff.

85. Defendants' misrepresentations, as described in this Complaint, include making misrepresentations about Defendants' ability to timely deliver quality equipment, and Defendants' efforts to hide from customers, like Plaintiff, their failures to do so by forcing complaining customers into arbitration, bullying customers into removing negative public comments about Defendants, and/or forcing aggrieved customers to sign NDAs.

86. Defendants also failed to disclose that they had no intention of timely delivering Plaintiff's equipment.

87. Defendants also misrepresented that they were making progress on Plaintiff's equipment, when they had in fact, not even started working on Plaintiff's equipment.

88. Defendants knew, or should have known, that their misrepresentations were false when they made them.

89. Defendants made these misrepresentations with the intent to deceive Plaintiff and did deceive Plaintiff by virtue of inducing Plaintiff into sending Defendants approximately $75,000.

90. Plaintiff relied on Defendants' misrepresentations to its detriment and has suffered damages in an amount to be proven at trial.

91. Defendants' conduct was willful, wanton, or reckless such that an award of punitive damages is appropriate.

## COUNT V: VIOLATIONS OF THE UPA

92. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

93. New Mexico has a public policy embodied in the New Mexico Unfair Trade Practices Act that prohibits companies and individuals from engaging in unfair/deceptive trade practices against New Mexico consumers.  See NMSA 1978, § 57-12-1 et seq.

94. As the result of the conduct described herein Defendants have violated the New Mexico Unfair Trade Practices act by engaging in unfair, deceptive, trade practices by engaging in conduct, including but not limited to:

      a.  Causing confusion or misunderstanding as to the source, sponsorship, approval or certification of goods and services;

      b.  Using deceptive representations or designations of geographic origin in connections with goods or services;

      c.  Representing goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another;

      d.  Using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive;

      e.  Failing to deliver the quality or quantity of goods or services contracted for.

95.  Defendants have also violated the New Mexico Unfair trade Practices Act by engaging in unconscionable trade practice as defined by the Act by taking advantage of Plaintiff's lack of knowledge, ability, experience, or capacity to a grossly unfair degree as described herein.

96. Defendants' conduct has resulted in a gross disparity between the value received by Plaintiff and the price paid.

97.  As the result of Defendants' violations, Plaintiff is entitled to damages in the amount of treble its actual damages and attorney fees as provided in the Act.

## COUNT VI: CONVERSION

98. Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

99. Plaintiff had the right of possession of personal property, its money.

100.    Plaintiff demanded that the Defendants return the property to Plaintiff;

101.    Defendants refused to return the property to Plaintiff, and instead have exercised dominion and control over it and converted the money to Defendants' own use.

102.    Plaintiff has been damaged by Defendants' conversion in an amount to be proven at trial.

## COUNT VII: UNJUST ENRICHMENT

103.    Plaintiff incorporates by reference all of the foregoing allegations as though fully set forth herein.

104.    Defendants have knowingly benefitted by virtue of keeping Plaintiff's money.

105.    Defendants have benefited in a manner such that allowing Defendants to keep Plaintiff's money would be unjust.

106.    The Court should grant the equitable remedy of unjust enrichment and require Defendants to return Plaintiff its money.

WHEREFORE, Plaintiff prays for judgment against Defendants for compensatory damages, punitive damages, the costs of this action, treble damages, attorney fees, and whatever additional relief the Court may deem just and proper.

FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD P.A.


By: */s/ H. Jesse Jacobus*
    H. Jesse Jacobus, III
    Frank T. Davis
    20 First Plaza, Suite 700

13

Albuquerque, NM  87102
Phone 505.842.9960
Fax 505.842.0761
hjj@fbdlaw.com
ftd@fbdlaw.com

*Attorneys for Plaintiff*

I HEREBY CERTIFY that on the 6th of February 2019, I sent a copy of this pleading to Defendant Corson, at its last known address via both regular and certified mail.

*/s/ H. Jesse Jacobus*
H. Jesse Jacobus, III

14